UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| MARTIN AKEEM DANIEL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 1:07-CV-00001-SNLJ |
| ) | |
| BRUCE FARMER AS DEFENDANT AD ) | |
| LITEM FOR E. RALPH COLLETT, ) | |
| DECEASED, ET AL., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

Plaintiff has filed this §1983 action alleging that he was denied adequate medical treatment for his impacted wisdom teeth in violation of the Eighth and Fourteenth Amendments. He asserts that his requests to prison guards, supervisors and nurses for dental care were deliberately ignored or delayed and resulted in injury. This matter is before the Court on defendants Bruce Farmer (as defendant ad litem for deceased Ralph Collett), Debra Jaynes, Marsha Aters, Rebecca Byassee, Becky Lizenbee, Debra Dale, Kathy French, Sandra Blankenship, Deborah Vinson, Stephanie Kasting, Jimmie Bell, Ernest Jackson, Correctional Medical Services (CMS) and Jackson Institutional Dental Services (JIDS) motion for summary judgment (#106), filed on March 3, 2009. Responsive pleadings have been filed and the matter is now ripe for disposition.

**I. Case Summary**

Plaintiff is an inmate in the custody of the Missouri Department of Corrections (MDOC) and confined at the Southeast Correctional Center (SECC) in Charleston, Missouri. Defendant Dr. E. Ralph Collett, now deceased, was a licensed dentist and independent contractor dentist

employed by JIDS providing dental care to inmates at SECC. Defendant Stephanie Kasting is the Health Services Administrator for CMS at SECC. Defendant Debbie Vinson is the Director of Nursing for CMS at the SECC. Defendant Dr. Earnest Jackson is a licensed dentist and the Chief Executive Officer of JIDS. Defendants Debra Jaynes, Marsha Aters, Rebecca Byassee, Becky Lizenbee, Debra Dale, Kathy French, Jimmie Bell, and Sandra Blankenship are or were employed by CMS to provide nursing care to inmates at SECC. Defendant CMS is a private medical care entity providing medical care to inmates within the MDOC. CMS utilizes the services of independently contracted physicians to prove medical care for inmates of MDOC.

Medical care is accessible to prisoners in the custody of CMS by completing a medical services request form (MSR), self-declaring a medical emergency, or appearing for "sick call." The Missouri Department of Corrections sets forth the policy for self-declaring a medical emergency in their Policy and Procedure Manual, which defines an emergency situation as "a condition that requires immediate attention in order to preserve life or body function." (Defendants' Exhibit G, II.A). If the medical staff determines that the condition is not of an emergent nature, the offender will be advised to submit an MSR. (Defendants' Exhibit G, III.D.1).

Plaintiff alleges that beginning in early March 2006 while at SECC he began to experience pain in the back of his mouth associated with incoming wisdom teeth. (Defendants' Exhibit A, 22:24-25, 23:1-5). Plaintiff submitted his first MSR on the first or second of March for treatment of his wisdom teeth and was given pain pills by Nurse Jaynes. (Plaintiff's Exhibit 1, p.22:24-p.23:19). Two or three weeks later, Plaintiff was in a GED class, informed his teacher that he was having pain in his mouth and requested to self-declare a medical emergency. (Plaintiff's Exhibit 1, p. 18:10-19:17). Plaintiff left to see the medical staff and saw nurse

2

Jimmie Bell. (Plaintiff's Exhibit 1, p. 22:6). Nurse Bell allegedly told Plaintiff that he was "too old to just now be having my wisdom teeth to come in," gave him a box of Motrin, and told him to return to class. (Plaintiff's Exhibit 1, p. 22:7-20). Plaintiff testifies that the next time that he requested medical treatment for his teeth was six weeks later when he was placed in administrative segregation on April 20. (Plaintiff's Exhibit 1, p.24:15-21).

On April 19, plaintiff self-declared a medical emergency for a nosebleed allegedly sustained when another inmate elbowed him, and was seen by Nurse Blankenship and Dr. Hakala. (Defendants' Exhibit B, 255-257). During this visit, Dr. Hakala assessed plaintiff's teeth and upper jaw and noted no loose teeth, plaintiff could bite without pain, and there was no evidence of tongue or gum lacerations. (Defendants' Exhibit B, 256-257). Dr. Hakala prescribed 800mg Motrin and an ice pack for plaintiff's face. (Defendant's Exhibit B, 256-257). Plaintiff admits that as of April 19, 2006, his wisdom teeth had not become infected. (Statement of Facts, Doc. # 115, p. 5).

After his visit with Dr. Hakala on April 19, 2006, plaintiff was placed in administrative segregation. (Plaintiff's Exhibit 1, p.24:20-21). Plaintiff alleges that he submitted an MSR on April 20, to which he never received a response. (Plaintiff's Exhibit 3) The very next day, however, plaintiff failed to appear for his April 21 scheduled follow-up appointment with Dr. Hakala, although plaintiff argues that this was due to his placement in administrative segregation. (Defendants' Exhibit B, 257).

On April 30, 2006, plaintiff barricaded his food port with sheets, blankets and clothing items, which required custody staff to implement the use of force. (Defendant's Exhibit C, 4-5). Plaintiff claims that he "acted out to get medical attention" by refusing to close his food port. (Defendant's Exhibit A, p.33:7). Nurse Bell conducted a medical assessment of plaintiff after

3

pepper spray was deployed and noted no injuries. (Defendants' Exhibit C, 5, 18). There was no mention or report in the inter-office memorandum related to any medical or dental complaints or inability to access care. (Defendants' Exhibit C, 1-18).

While in administrative segregation, beginning April 19, 2006, plaintiff testified that he slid his MSR forms through the side of his cell door, and they were collected by a nurse after lunch of each day. (Defendants' Exhibit A, 27). Plaintiff's contact and complaint with each of the defendant nurses arose during their medication rounds between April 19 and May 15, 2006. (Defendants' Exhibit A, 28, 53:4-10). Plaintiff alleges that during this period he submitted at least 15 MSRs requesting treatment for his incoming wisdom teeth, and was unable to see a dentist in response to these requests. (Plaintiff's Exhibit 1, p. 29:4-7). Plaintiff alleges that defendant nurses Jaynes, Bell, Atters, Byassee, Lizenbee, Dale, French and Blankenship did not collect his MSRs, and ignored his attempts to self-declare a medical emergency for serious pain. (Defendants' Exhibit A, 28:6-23). Plaintiff further alleges that Nurse Byassee said the "policy don't matter," and that nurses Dale and French told plaintiff to "wait until the next day and self-declare instead of self-declaring on [their] shift." (Plaintiff's Exhibit 1, p.56:20-57:8; p. 59:8-17). Plaintiff alleges that Nurse Atters would simply walk off during his complaints. (Plaintiff's Exhibit 1, p. 56:10-14). During this period between April 20th and May 17, Nurses Bell, Byassee, Jaynes, and Atters variously assessed plaintiff on their rounds and noted no complaints or signs of distress. (Defendants' Exhibit B, 258-281). Plaintiff's medical records show that nurses French and Lizenbee had no contact with plaintiff while in administrative segregation. (Defendants' Exhibit B, 279-286).

Between March 2006 to May 14, 2006 plaintiff submitted 13 MSRs for separate medical issues, including requests for mental health care, a knee injury sustained while playing

4

basketball, athlete's foot, a skin rash, a request for information about diabetes and hypertension, and duplicate requests for psychiatric medication. (Defendants' Exhibit B, 771-786). On March 15 Plaintiff failed to appear for a scheduled appointment, and on April 4 he refused his scheduled sick call appointment. (Defendants' Exhibit B, 251-255, 686). In addition to these requests and the 15 MSRs mentioned *supra*, plaintiff testified that he retained personal copies of MSRs dated March 6, March 16, April 7, and April 20 that are not contained in his authenticated medical file, all of which request medical treatment for his incoming wisdom teeth. (Plaintiff's Exhibit 1, p. 29:4-7). Plaintiff alleges that his authenticated medical file contains three MSRs for another inmate, Mr. Larrell M. Wright, and a consent form that bears Mr. Daniel's inmate identification number but is signed by another inmate. (Plaintiff's Exhibit 4) Plaintiff also asserts that the log sheet kept by prison guards for March 6, 2006 shows that he self-declared a medical emergency for a hernia, yet there is no corresponding entry by the medical staff on March 6, 2006 in plaintiff's authenticated medical file to reflect this fact. (Plaintiff's Exhibit 5).

Plaintiff's medical records show that on May 15, 2006, between three to four weeks after being placed in administrative segregation, plaintiff self-declared a medical emergency for a toothache. Nurse Jaynes responded to plaintiff's May 15 complaint and documented his toothache and reported plaintiff's complaints of swelling and bleeding. Nurse Jaynes noted no swelling or bleeding, and informed plaintiff that his symptoms were normal for wisdom teeth coming in. Nurse Jaynes instructed plaintiff to submit an MSR and spoke with the dental assistant. (Defendants' Exhibit B, 278). Nurse Jaynes also saw plaintiff that day for a complaint that he was hit in the stomach. (Defendants' Exhibit B, 279). She examined plaintiff and he was provided with pain medication. Plaintiff submitted an undated MSR to "get his wisdom teeth

pulled ASAP." (Defendants' Exhibit B, 786). The MSR is stamped received on May 16 and signed by Nurse Jaynes with a referral to the dental department. (Defendants' Exhibit B, 786).

Dr. Collett, a dentist, saw plaintiff on May 18, 2006. On examination, Dr. Collett observed that one of plaintiff's wisdom teeth was partially erupted and hurting. He prescribed plaintiff with 600 mg Motrin and 250 mg of amoxicillin to be taken for a period of 10 days. (Defendants' Exhibit B, 279). On May 22, plaintiff reported a reaction to the amoxicillin, and Dr. Collett replaced the medication with clindamycin. (Defendants' Exhibit B, 284-285).

On June 5, almost three weeks after plaintiff first saw Dr. Collett, Nurse Jaynes saw plaintiff for complaints of severe tooth and jaw pain, checked with the dental department and issued plaintiff ibuprofen for his pain. (Defendants' Exhibit B, 292). On June 5, Dr. Jackson approved a referral request from Nurse Jaynes for plaintiff to see oral surgeon, Dr. Pernoud, to extract teeth #1, 16, 17, and 32 on June 12. (Defendants' Exhibit B, 293). During this time, plaintiff had no direct communication with Dr. Jackson regarding his dental care. (Defendants' Exhibit A, 46:9-11).

On June 9, plaintiff submitted an MSR requesting to get his wisdom teeth pulled. Nurse Bell signed the MSR and noted that plaintiff's scheduled appointment with the oral surgeon was for June 12, 2006. On June 12, plaintiff 's wisdom teeth were extracted without complication. (Defendants' Exhibit B, 293, 787).

Plaintiff submitted unrelated MSRs on June 26 and June 27 for right thumb pain. On June 30, Debbie Vinson, Director of Nursing, issued her Response to plaintiff's Informal Resolution Request, where plaintiff requested to see an outside specialist to have his teeth pulled. On July 3 and 4, plaintiff submitted three MSRs that simply stated "about wisdom teeth," and "I still got holes in my mouth." Nurse Jaynes and Nurse Bell referred the MSRs to the dental

6

department. On July 13, July 14, July 18, July 21, July 24 and July 25, plaintiff submitted MSR for various medical requests, and self-declared an emergency for another unrelated medical problem that was deemed not a medical emergency.

On July 26, plaintiff submitted an MSR for pain in his face and jaw after his wisdom teeth extraction. (Defendants' Exhibit B, 800). Prison dentist, Dr. Weathers, saw plaintiff the next day of July 27, assessed plaintiff's surgical extraction sites and noted plaintiff was not completely healed. (Defendants' Exhibit B, 334). Dr. Weathers ordered x-rays, which showed no evidence of dry sockets. Plaintiff was instructed on hygiene, not to pick at the healing sockets, and prescribed 400 mgs of Ibuprofen. (Defendants' Exhibit B, 941).

From August 1 to August 27, plaintiff submitted 12 separate MSRs and was seen by medical staff for these unrelated medical issues, which also included two self-declared medical emergency for a sprained ankle and right hand pain. (Defendants' Exhibit B, 801-813, 335-344). On August 18, plaintiff again self-declared a medical emergency for jaw pain and a request for a soft food tray. Debbie Vinson saw plaintiff, assessed his vital signs and concluded plaintiff's complaint did not constitute a medical emergency. (Defendants' Exhibit B, 348). On August 27, plaintiff self-declared a medical emergency for complaints of jaw pain from his extracted wisdom teeth on June 12. Nurse Dale assessed plaintiff, took his vital signs and instructed plaintiff to follow the orders of his doctor and to submit an MSR for follow-up dental care. (Defendants' Exhibit B, 350).

On August 28 and 29, plaintiff submitted duplicate MSRs for reported pain in his jaw and face/cheek. (Defendants' Exhibit B, 813-814). On August 30, Dr. Weathers saw plaintiff for a complaint related to pain at a tooth that he wanted extracted. Dr. Weathers prescribed medication and entered his treatment plan for the extraction of the tooth and x-rays.

7

(Defendants' Exhibit B, 358). Dr. Weathers' August 30 record includes no complaints, treatment or mention of plaintiff's removed wisdom teeth or the surgical sites. (Defendants' Exhibit B, 358). There are no further MSRs related to plaintiff's teeth after August 30, 2006, and plaintiff has no problems with his wisdom teeth today. (Defendants' Exhibit A, 38:22).

## II. Summary Judgment Standard

Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. *New England Mut. Life Ins. Co. v. Null*, 554 F.2d 896, 901 (8th Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *Mt. Pleasant v. Associated Elec. Coop. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988).

Pursuant to Fed.R.Civ.P. 59(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467, 82 S. Ct. 486, 7 L.Ed.2d 458 (1962). The burden is on the moving party. *Mt. Pleasant*, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

8

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir. 1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976). With these principles in mind, the Court turns to the discussion.

## III. Discussion

To establish that the defendants' conduct violated the Eighth Amendment's prohibition against cruel and unusual punishment, Daniel must demonstrate that the individual defendants were deliberately indifferent to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Meloy v. Bachmeier*, 302 F.3d. 845, 848 (8th Cir. 2002); *Robinson v. Hager*, 292 F.3d. 560, 563-64 (8th Cir. 2002); *Jolly v. Knudsen*, 205 F.3d. 1094, 1096 (8th Cir. 2000); *Logan v. Clark*, 119 F.3d. 647, 649 (8th Cir. 1997). An inmate must establish both the objective and subjective components of a §1983 inadequate medical treatment claim; i.e., must show both that the inmate had an objectively serious medical need and that the defendants actually knew of and deliberately disregarded that need. *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009); *Meloy*, at 848; *Robinson*, at 564; *Jolly*, at 1096; *Coleman v. Rahija*, 114 F.3d. 778, 784 (8th Cir. 1997); *see also*, *Farmer v. Brennan*, 511 U.S. 825 (1994); *Wilson v. Seiter*, 501 U.S. 294 (1991); *Estelle v. Gamble*, 429 U.S. at 105. Deliberate indifference may be manifested by the manner in which prison doctors respond to an inmate's medical needs or by prison officials intentionally denying or delaying access to medical care, or interfering with an inmate's proscribed medical treatment. *Meloy*, at 849 (*citing Estelle v. Gamble*, 429 U.S. at 104-05); *Roberson v. Bradshaw*, 198 F.3d. 645, 647 (8th Cir. 1999).

A "serious medical need" is one "that has been diagnosed by a physician as requiring treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Coleman*, at 784 *(quoting Camberos v. Branstad*, 73 F.3d. 174, 176 (8th Cir. 1995)); *see also Simmons v. Cook*, 154 F.3d. 805, 807-08 (8th Cir. 1997) *quoting Moore v. Jackson*, 123 F.3d. 1082, 1086 (8th Cir. 1997)("A medical need is serious if it is obvious to the layperson or supported by medical evidence."). When an inmate alleges that a delay in medical treatment constituted a constitutional deprivation, "the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment." *Keeper v. King,* at 1314-15; *Coleman*, at 784; *Crowley v. Hedgepeth*, 109 F.3d. 500, 502 (8th Cir. 1997). Furthermore, to impose liability, the inmate must demonstrate that the delay was prompted by "obduracy and wantoness, not inadvertance or error in good faith." *Ruark v. Drury*, 21 F.3d. 213, 216 (8th Cir. 1994) (*quoting Whitley v. Albers*, 475 U.S. 312, 219 (1986)). "An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Beyerbach v. Sears*, 49 F.3d. 1324, 1326 (8th Cir. 1995). A failure by an inmate to place such supporting medical evidence in the record to establish the detrimental effect of the alleged delay in medical treatment "precludes a claim of deliberate indifference to medical needs." *Coleman*, at 784 *citing* Crowley*, at 502.*

In order to satisfy the subjective component of an Eighth Amendment medical claim, a plaintiff inmate must show that the prison official(s) had actual knowledge of, yet disregarded, an excessive risk to the inmate's health. *Keeper v. King*, at 1314 (*quoting Logan v. Clarke*, 119 F.3d. 647, 649 (8th Cir. 1997)); *see also*, *Farmer v. Brennan*, 511 U.S. at 837. A prison official may be liable under the Eighth Amendment if s/he knows that an inmate faces a substantial risk

of serious harm and fails "to take reasonable measures to abate it." *Coleman*, at 785 *citing Farmer v. Brennan*, 511 U.S. at 847. "[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Coleman*, at 785 (quoting *Long v. Nix*, 86 F.3d. 761, 765 (8th Cir. 1996)). A prison official's requisite knowledge may be established circumstantially or from the fact that the seriousness of the medical need was obvious. *Coleman*, at 786 *citing Farmer v. Brennan,* 511 U.S. at 842.

After a close look at the facts on record, it is clear that plaintiff is a prodigious user of the medical services provided to the SECC and is no stranger to the CMS staff. Looking at the facts in a light most favorable to the plaintiff, it is difficult to see how there could have been any showing of deliberate indifference towards his medical needs for the first two months of the period in dispute. From the very beginning of March until May 18, the plaintiff was seen by nurses or other medical staff countless times and not once was there an objectively serious medical need that was not addressed. As late as May 15, defendant Nurse Jaynes responded to plaintiff's complaint for his wisdom tooth and noted no swelling or bleeding, either of which would have provided strong evidence of an objectively serious medical need. Even if there were a few MSRs that were lost or misplaced, even if nurses made inappropriate responses to some of plaintiff's many requests, and even if medical staff outright refused to listen to plaintiff's complaints on various occasions, all of these actions could not have triggered an Eighth Amendment violation, for any deliberate indifference to plaintiff's condition was not accompanied by an objectively serious medical need.

The earliest date for which the plaintiff almost makes a colorable argument for an objectively serious medical need is May 18. Plaintiff saw Dr. Collett on that date, and the dental assessment notes from that appointment indicate that one of plaintiff's wisdom teeth was partially erupted and hurting. It can be inferred that in addition to this short assessment there was some evidence of infection around the wisdom tooth, as Dr. Collett prescribed an antibiotic to the plaintiff. While Dr. Collett prescribed pain medication and antibiotics, there is no evidence demonstrating that Dr. Collett scheduled an appointment for an oral surgeon. It was not until June 5 that Nurse Jaynes saw plaintiff for complaints of severe tooth and jaw pain and submitted a referral request to Dr. Jackson for plaintiff to see an oral surgeon, by which time he was manifesting infections in three more teeth.

Plaintiff argues that Dr. Collett was "deliberately indifferent" to his "serious medical condition", but this court is still not convinced of either element. With regards to deliberate indifference by Dr. Collett, plaintiff fails to show how the steps that his dentist took were inappropriate, much less deliberately indifferent. While plaintiff argues that Dr. Collett should have referred him to an oral surgeon soon after his dental appointment, the only support he offers for this proposition is *Boyd v. Knox*, 47 F.3d 966 (8th Cir. 1995), a case involving a serious medical need of a different order of magnitude. In *Boyd*, the dentist examined the prisoner's impacted and infected wisdom tooth and decided to refer him to an oral surgeon, yet for reasons that are unclear, the dentist waited three weeks to complete the referral. *Id.* at 969. In addition, the prisoner's mouth was so swollen that he could barely open it, and pus regularly oozed from the infection. *Id.* While the current case appears similar in duration, Dr. Collett appeared to be actively working with the plaintiff to treat his condition. Dr. Collett provided him with antibiotics to control the infection, and when they caused a reaction, he immediately changed the

12

prescription. This is not evidence of deliberate indifference. Furthermore, there is no evidence in the record showing that it is out of the ordinary to wait for inflamation or infection to recede before proceeding with oral surgery.

Even if Dr. Collett was negligent in the timeliness of his referral, it is difficult to see how he, or the nursing staff, were deliberately indifferent during the period between May 22 and June 5. The reports from the administrative segregation rounds each day during the period show that plaintiff was quiet and without complaint. While it is troublesome that plaintiff's condition presumably progressed from the infection of one tooth to four during that period, he did not notify the nurses of any issues until June 5, by which point he was attended to swiftly.

In comparison with the prisoner in *Boyd,* the plaintiff's condition was substantially less serious. Here, plaintiff was able to open his mouth without difficulty, there was no evidence of bleeding, no evidence of puss oozing from his infection, and notably, no complaint during the time period between dentist evaluation and referral for extraction. If we are to follow the guiding principle that a medical need is serious if it is obvious to the layperson, it seems that there is a stark contrast between the facts in *Boyd* and the present case. While the serious nature of the prisoner's condition in *Boyd* seems palpably obvious to any layperson, the same can hardly be said of the instant case.

The other case to which plaintiff cites, *Hartsfield v. Colburn*, 491 F.3d 394 (8th Cir. 2007), also seems to be of a different order of magnitude. In *Hartsfield*, the prisoner did not receive ibuprofen while he awaited treatment, blood seeped from his gums, an infection developed, his mouth became swollen, and he had difficulty eating and sleeping. *Id.* at 397. Furthermore, there was evidence that defendants may have delayed the prisoner's referral for

misconduct or security issues. *Id.* Again, that degree of serious medical need did not appear to be present in this case, and the deliberate inaction referred to in *Hartsfield* is absent as well.

Plaintiff also seeks to hold CMS, JIDS, and Dr. Jackson liable under 42 U.S.C. §1983. Plaintiff claims that defendants CMS, JIDS, and Dr. Jackson had inadequate supervision practices, and failed to assure that medical and dental treatment were provided to inmates. Plaintiff also claims that CMS and JIDS had inadequate hiring and retention practices of its employees. As to the nature of these claims, if they are based on *respondeat superior* because CMS, JIDS, and Dr. Jackson are the employers of the individual defendants, then such claims fail because the doctrine of *respondeat superior* is inapplicable in §1983 actions. *Givens v. Jones*, 900 F.2d. 1229, 1233 (8th Cir. 1990); *Wilson v. City of Little Rock*, 801 F.2d. 316, 322 (8th Cir. 1986); *Martin v. Sargent*, 780 F.2d. 1334, 1338 (8th Cir. 1985). Furthermore, if plaintiff is attempting to show that Dr. Jackson was deliberately indifferent to plaintiff's medical need, then that also fails because Dr. Jackson acted immediately to approve the referral request for the oral surgeon.

Plaintiff also attempts to use an Eighth Circuit decision, *Moore v. Jackson*, 123 F.3d 1082 (8th Cir. 1997), to show that medical service providers under contract to serve state penitentiary systems can be held liable for a constitutional violation when they have a policy or custom for destroying or ignoring MSRs. In this matter, there is no evidence to suggest that there are systemic problems with the CMS medical system other than from the plaintiff's limited and dubious evidence of misplaced MSRs. This case is different from *Moore*, in that plaintiff's teeth were not infected, inflamed, or bleeding at the time of the complaints, and there was not a period of seven months between initial complaint and extraction. While it may be the case that MSRs

went missing during the first two months at issue, there was no objectively serious medical need related to plaintiff's teeth until after May 15, well after any of the MSRs allegedly disappeared.

For all these reasons, summary judgment will be granted as to defendants Jaynes, Atters, Byassee, Lizanbee, Dale, French, Blankenship, Vinson, Kasting, Bell, Jackson, Collett, CMS, and JIDS.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motion is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff's claims are dismissed in all other respects.

Dated this   22nd   day of September, 2009.

_____
UNITED STATES DISTRICT JUDGE